# IN THE SUPREME COURT OF IOWA

No. 13–2046

Filed October 30, 2015

**DEREK CROW,**

   Appellant,

vs.

**EDWIN E. SIMPSON,** Individually and d/b/a **SIMPSON TRUCKING AND EXCAVATING,**

   Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Monroe County, Myron L. Gookin, Judge.

The defendant seeks further review of a court of appeals decision granting the plaintiff a new trial. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Alfredo Parrish and Matthew M. Boles of Parrish Kruidenier Dunn Boles Gribble & Gentry L.L.P., Des Moines, for appellant.

Paul Zingg of Denefe, Gardner, & Zingg, P.C., Ottumwa, for appellee.

**WIGGINS, Justice.**

Plaintiff brought an action against a contractor, alleging the contractor was negligent at a work site and the contractor's negligence caused the plaintiff damages. A jury returned a verdict in favor of the contractor, finding the contractor was negligent but his negligence was not the cause of any item of the plaintiff's damages. The plaintiff appealed. We transferred the case to the court of appeals. The court of appeals concluded substantial evidence did not support the verdict and ordered a new trial. We granted further review.

On further review, we find substantial evidence supports the jury verdict, the jury's answers to the verdict interrogatories were not inconsistent, the district court's denial of plaintiff's motion for directed verdict was harmless error, and the district court did not abuse its discretion in finding the verdict effected substantial justice. Therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Edwin Simpson operates a trucking and excavation business and performs various duties for the City of Albia including, among other things, digging for the sewer and water departments. On July 29, 2008, Simpson obtained a building permit to move his house from Pella to North Ninth Street in Albia. Prior to commencing work on the sewer connection, Simpson attempted to obtain the necessary permit from the city, but the city clerk responsible for issuing permits was on vacation. However, Simpson called Tom Murphy, the city sanitation director, and received verbal permission to dig up the street and connect the sewer lines.

On August 28, Simpson dug a hole in the street, connected the sewer lines, and filled the hole with sand and rock. On August 29, he removed some of the rock and added flowable mortar that takes approximately twenty-four hours to set. Simpson put cones around the rectangular patch of wet mortar. He also parked his yellow front-end loader behind it to ensure that no one drove onto the mortar while it was setting. The end loader occupied more than half the width of the right lane of the street. Simpson did not place any cones or barricades with flashing lights behind the end loader to warn drivers of the obstruction in the road, although he had those materials at his garage approximately four blocks away from the construction site. However, an orange reflective placard approximately thirteen inches in height was affixed to the back of the end loader at a height of approximately five feet, indicating that it was a slow-moving vehicle.

On August 29, Derek Crow, who was starting his senior year of high school, attended the first football game of the season with a friend, Brianna Baylor. After the game, Baylor went to a slumber party. In the early morning hours of August 30, Crow and Baylor texted each other and decided to meet at the city pool parking lot so he could ride her moped. Baylor snuck away from the slumber party with a friend, Brooke Sinnott, and met Crow at the parking lot. Crow had been riding motorbikes since the age of seven; he had ridden mopeds before and really enjoyed it. But according to Baylor, Crow told her he had never driven a moped before, and she showed him how to operate it. The moped had hand brakes. The right hand operated the front brake, and the left hand operated the rear brake. The headlights came on automatically when the ignition switch was turned on, but turning on the high beams required the driver to hit a switch with his or her left

thumb. That night, Crow's left wrist was injured, so he was wearing a cast on his left arm and hand.

Crow took Baylor's moped out for a ride around Albia. At the time, it was very dark because there was a new moon that night.[1] Crow drove around town, eventually making a left turn from D Avenue to head north onto North Ninth Street, where Simpson had left his end loader parked overnight. After turning the corner, Crow came upon the end loader and crashed the moped while attempting to brake. He described seeing something "big and yellow" before grabbing for the moped's brakes.

Crow does not recall how long he remained on the ground before he called Baylor to let her know about the accident. During that call, Crow told Baylor he had crashed her moped on a gravel road. Crow then called two friends, Zachriah Reed and Anthony Smith, to get a ride back to his car. On the way, Crow encountered Baylor, and she asked him where her moped was. Baylor and Sinnott then walked around, searching for the moped. As they walked south on North Ninth Street, they approached the front of the end loader. Though she was using the light from her cell phone to navigate the dark street, Baylor was able to see the end loader from about a block away. She located her moped behind the end loader and tried unsuccessfully to start it.

After returning to his car, Crow drove back to the scene of the crash and helped Baylor push the nonoperational moped back to her house. Crow then returned home. He put many small bandages on his hand because it was torn up from the accident. Then he told his mother,

---

[1]There was also a street light out above the end loader; however, the court instructed the jury it could not consider the nonworking street light as a factor in determining whether Simpson was negligent or at fault. Simpson did not object to the instruction; therefore, it became the law of the case for purposes of our review of the record for sufficiency of the evidence. *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009).

Debra Crow, that his head hurt and lay down in his living room. When she prompted him for an explanation, Crow told her he had fallen at the football game.

Shortly thereafter, Crow's mother noticed the bandages and realized that Crow was acting strangely. When Crow began projectile vomiting shortly thereafter, she and her husband, Randy Crow, took him to the local hospital. The Monroe County Hospital determined that Crow had suffered a head injury and immediately transported him to Iowa Methodist Medical Center in Des Moines via life-flight.

At Methodist, Dr. Joseph Sherrill operated on Crow. Crow had suffered an acute epidural hematoma, or blood clot, on the right side of his brain, which caused his brain to shift fifteen millimeters to the left. Dr. Sherrill removed part of the blood clot and then decided to end the operation due to the fact Crow had experienced significant blood loss. Dr. Sherrill knew that Crow had suffered some sort of trauma but could not definitively determine the type of trauma. He stated that because of the blood found on the surface of Crow's brain, he might have believed it if he had been told that Crow suffered a seizure and then fell off the moped. However, he did not opine as to the precise cause of Crow's injuries.

Crow was transferred to the University of Iowa Hospitals in Iowa City. In Iowa City, Dr. Jeremy Greenlee performed a second surgery on Crow. Dr. Greenlee removed more of Crow's skull, removed the rest of the blood clot, and stopped the bleeding in his brain. Following the surgeries, Crow remained unconscious for a couple of days, but he was able to return home just over one week after the accident.

The day after the accident, Crow's friend Reed returned to the scene of the accident with his mother, Tammy Reed. They observed

plastic on the ground, blood on the tire of the end loader, and skid marks on the street behind the end loader. Tammy took pictures. Sinnott also returned to the scene the next day with another friend of Baylor's, Ally Bettis, to try to locate the fender of Baylor's moped. The girls found the fender in the ditch next to the road and Crow's class ring under the end loader. Later, Bettis recalled talking to Crow about the accident after he returned to school. She recalled Crow stating that he remembered braking, hitting some sand in the road, and laying the moped down on its side. She also recalled Crow telling her on the night of the accident someone was chasing him.

This appeal is the result of Crow's second trial on this matter. Crow filed a petition against Simpson and other defendants who were later dismissed from the action. He alleged that Simpson's negligence in leaving the end loader in the street caused the accident and his subsequent injuries. In the first trial, the jury found Simpson was not at fault for the accident. The district court granted Crow's motion for a new trial on the grounds that the jury failed to follow the jury instructions and the verdict did not effect substantial justice. The court of appeals upheld the district court's decision granting Crow a new trial.

The district court held a second trial in October 2013. At that trial, the jury heard testimony from sixteen individuals and reviewed numerous exhibits. The jury heard competing expert testimony from accident investigators and reconstructionists Ray Knight, Todd Hall, and David McMahon.

Knight formed his opinion regarding the cause of the accident after visiting the site of the accident, viewing photos of the accident scene, reviewing the report of investigators McMahon and Hall, and reviewing deposition testimony and other medical records and exhibits. Based on

that evidence, Knight determined Crow was traveling between twenty-five and twenty-seven miles per hour on North Ninth Street at the time of the crash. He agreed with McMahon's assessment that Crow would have been able to see the end loader from approximately ninety-three to ninety-nine feet away. Knight testified that he observed a skid mark approximately nine feet in length ending approximately fifteen feet before the end loader in the accident-scene photographs. Consequently, he believed that Crow began breaking about twenty-four feet before the end loader. Assuming a two-second reaction time due to the unexpected presence of the end loader in the road and the darkness, Knight concluded that the presence of the end loader caused the collision because it required Crow to take abrupt evasive action. He further determined that after Crow hit the brakes, the moped went down on its left side and eventually slid under the end loader. In Knight's opinion, at some point, Crow separated from the moped and hit the end loader.

However, Knight acknowledged that he could not be sure the moped caused the skid mark in the photographs and that he found no gouges in the street from the moped sliding on the pavement. He admitted he never conducted nighttime testing or physically examined the moped or the end loader. Ultimately, he acknowledged the moped could not have collided head-on with the end loader as Crow had described.

McMahon and Hall testified that in the course of their investigation of the accident they found and examined Baylor's moped, which had been sold to another individual by that time. Because the new owner had altered Baylor's moped by removing its governor, Hall and McMahon also purchased an unmodified moped of the same make, model, and year as Baylor's moped. Based on tests they ran on the unmodified moped at

the location of the accident, they determined the top speed at which they could make it turn the corner onto North Ninth Street was twenty-five to twenty-seven miles per hour. They also tested the braking capabilities of the unmodified moped, with the average stopping distance measuring just under twenty-two feet when the moped was travelling at twenty-five miles per hour.

Finally, McMahon and Hall attempted to recreate the conditions on the street at the time of the accident on a night when there was a new moon. They parked Simpson's end loader at the approximate location it was at when the accident occurred and turned off the street lamp that had been nonoperational on the night of the accident. They then conducted testing to determine whether the end loader, or the reflective placard on the back of the end loader, would have been visible from a distance of ninety-five feet. Based on the results of these tests, McMahon and Hall concluded that, had Crow been travelling at twenty-five miles per hour and had a reaction time of one-and-a-half seconds, he should have been able to come to a complete stop eighteen feet from the end loader. They further concluded the moped did not collide with the end loader, but rather slid on its left side.

McMahon and Hall acknowledged that the presence of sand might have caused the moped to slide and testified they did not account for sand in their testing. They also acknowledged their investigation was not intended to determine how the accident occurred, as Knight's had been, but to determine if MidAmerican Energy Company shared fault for the accident due to the nonworking street light. They admitted they never actually reconstructed the accident. In addition, they admitted they never reviewed the police report of the accident because they were unaware that one existed.

The jury determined Simpson acted negligently, which the jury instructions defined as "doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances." However, the jury found Simpson's negligence did not cause any damage to Crow. The jury instructions indicated "conduct of a party is a cause of damage when the damage would not have happened except for the conduct."

Following the verdict, Crow moved for a new trial on the grounds the verdict was inconsistent, not supported by substantial evidence, and failed to administer substantial justice between the parties. Crow also argued the district court erred in denying his motion for a directed verdict on the grounds of negligence per se. The district court denied Crow's motion for a new trial, addressing each of his arguments.

Crow appealed. After we transferred the appeal to the court of appeals, the court of appeals held substantial evidence did not support the verdict and remanded the case for a new trial. Simpson sought further review, which we granted.

**II. Issues.**

In this appeal, Crow raises four issues. He claims substantial evidence did not support the jury verdict, the jury's answers to the verdict interrogatories were inconsistent, the district court erred in denying his motion for a directed verdict, and the district court abused its discretion in finding the verdict effected substantial justice.

**III. Scope of Review.**

We review a district court's ruling on sufficiency of the evidence for correction of errors at law. *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012). We review a district court's ruling denying a motion for a directed

verdict for correction of errors at law. *Pavone v. Kirke*, 801 N.W.2d 477, 486 (Iowa 2011). The question of whether verdict answers are inconsistent is also a question of law we review for errors at law. *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006). We review a district court's denial of a new trial for failure to administer substantial justice for an abuse of discretion. *Lehigh Clay Prods., Ltd. v. Iowa Dep't of Transp.*, 512 N.W.2d 541, 543–44 (Iowa 1994).

### IV.  Whether Substantial Evidence Supported the Verdict.

Evidence is substantial if " 'reasonable minds would accept the evidence as adequate to reach the same findings.' " *Pavone*, 801 N.W.2d at 487 (quoting *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008)). In reviewing whether a verdict is supported by substantial evidence, we "view the evidence in the light most favorable to the verdict, taking into consideration all reasonable inferences the jury may have made." *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 16 (Iowa 2000). " 'Evidence is not insubstantial merely because [courts] may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding.' " *Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012) (quoting *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004)). Because the issues of negligence and causation are questions for the jury, we will decide these issues as a matter of law only in exceptional cases. *Felderman v. City of Maquoketa*, 731 N.W.2d 676, 679 (Iowa 2007). Further, the jury is free to accept or reject any testimony, including uncontroverted expert testimony. *Eventide Lutheran Home for the Aged v. Smithson Elec. & Gen. Constr., Inc.*, 445 N.W.2d 789, 791–92 (Iowa 1989).

Crow bore the burden of proving that Simpson's negligence caused his harm by a preponderance of the evidence. *See Easton*, 751 N.W.2d at 5 ("Negligence is fault, and it is the plaintiff's burden to prove fault by a preponderance of the evidence."). The uncontested evidence showed Simpson failed to place proper warning signals around the street excavation and left his end loader parked in front of the newly poured mortar. The jury found Simpson negligent for this conduct.

However, the jury also found Simpson's negligence was not the cause of any item of Crow's damages. The issue on appeal is whether there was substantial evidence to support the jury's finding of no causation.

The district court instructed the jury that the defendant's conduct is a cause of the plaintiff's harm when the harm would not have happened except for the conduct. In addressing the question of whether the verdict was inconsistent, the district court noted the jury could have determined, based on the testimony by medical experts at trial, that Crow had suffered a precollision medical event, such as a seizure, that caused him to black out and fall off the moped, thereby causing his injuries. The district court also noted that six months after crashing into the end loader, Crow was involved in another accident in which he was thrown from a motorcycle. Thus, the district court suggested the jury could have found Crow's claimed injuries resulted from that motorcycle accident rather than the moped accident.

The court of appeals concluded that neither theory proposed by the district court as a potential explanation of the jury's verdict was supported by substantial evidence. The court of appeals noted Dr. Sherrill's statement that he might have believed Crow suffered a seizure and fell off the moped was made in the context of other

statements indicating it was impossible to determine how the trauma to Crow's head occurred because there were no witnesses to the accident. The court of appeals also concluded the evidence that Crow was involved in a subsequent accident did not support the jury's finding of no causation because "the evidence clearly established Crow suffered injuries discrete to the August 30, 2008 crash."

We take a different approach. Viewing the evidence in the light most favorable to the verdict, we conclude a reasonable jury could have found that, although Simpson was negligent for leaving the end loader in the middle of the road overnight, Crow's conduct at the time of the accident was the sole cause of his damages.

The jury heard uncontroverted testimony that Crow was in an accident on North Ninth Street. All the experts testified the damage to the moped was consistent with the bike sliding on the ground. However, the experts differed in their analysis of whether Crow could have avoided the collision by driving prudently. We know the jury determined Simpson was negligent for parking the end loader in the road and failing to place barricades or cones behind it. Nonetheless, the jury found Simpson's tortious conduct was not the cause of any item of Crow's damages. In other words, we know the jury concluded that someone's conduct other than Simpson's conduct caused Crow's damages.

The district court instructed the jury it could find Crow negligent for failing to keep a proper lookout. The jury instructions defined a "proper lookout" as follows:

> "Proper lookout" is the lookout a reasonable person would keep in the same or [a] similar situation. It means more than looking and seeing. It includes being aware of the operation of the driver's vehicle in relation to what the driver saw or should have seen.

The district court also instructed the jury that Crow's negligence could be a cause of his damages.

The evidence supports a finding that Crow should have been able to see the end loader from approximately ninety-three to ninety-nine feet away.[2] Simpson's experts testified that, based on the estimated reaction time of one-and-a-half seconds they believed to be appropriate, Crow should have been able to come to a complete stop within eighteen feet of the end loader or maneuver around it. From this testimony, a reasonable fact finder could conclude Crow did not keep a proper lookout because he collided with the end loader.

As to the causation issue, the district court instructed the jury consistent with the Restatement (Third) of Torts: Liability for Physical Harm and Emotional Harm. Section 29 of the Restatement provides that "[a]n actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." Restatement (Third) of Torts: Liab. for Physical Harm & Emotional Harm § 29, at 493 (2010). Again, a reasonable fact finder, relying on Simpson's expert testimony, could conclude Crow's failure to keep a proper lookout was the sole cause of Crow's damages because the presence of the yellow end loader and the reflective placard on the back did not alert Crow in sufficient time to allow him to avoid the accident. Therefore, additional warnings would not have allowed him to avoid the accident.

We recognize that, in reaching this result, the jury had to reject much of the testimony from Crow's expert. It is well-settled that the law

---

[2]In fact, McMahon and Hall testified that, had Crow had his high beams on, he could have seen the end loader from as far as 131 feet away. The jury never reached this issue because the district court instructed it not to if it answered the causation issue concerning Simpson's negligence in the negative.

requires a jury to consider expert testimony in the same manner it considers any other testimony. *See Crouch v. Nat'l Livestock Remedy Co.*, 210 Iowa 849, 851, 231 N.W. 323, 324 (1930) ("The ultimate weight which is to be given to the testimony of an expert is a question to be determined by the jury, and there is no rule of law which requires [a juror] to surrender [his or her] judgment to that of any person testifying as an expert witness, or to give controlling effect to expert testimony."). The jury may accept an expert's testimony or reject it. *Eventide Lutheran Home*, 445 N.W.2d at 791–92. After considering the expert's education and experience, the reasons given for the expert's opinion, and all other evidence in a case, the jury can give the expert's testimony as much weight as it thinks it deserves. *See id.*

Accordingly, we find substantial evidence supports not only the jury's finding that Simpson was negligent, but also the jury's finding that Simpson's negligence did not cause any item of Crow's damages.

**V.  Whether the Jury's Answers to the Verdict Interrogatories Were Inconsistent.**

The jury answered the first interrogatory in the affirmative finding Simpson negligent, but it answered the second interrogatory in the negative, finding Simpson's negligence did not cause any item of Crow's damages. Crow claims the jury's answers to these interrogatories are inconsistent with each other. We disagree.

In a comparative fault action such as this, a plaintiff is required to show both fault and causation. Iowa Code § 668.1(2) (2009). When we can harmonize the jury verdict in a reasonable manner consistent with the jury instructions, the evidence, and inferences the jury could have drawn from that evidence, the verdict is not inconsistent. *Clinton Physical Therapy*, 714 N.W.2d at 613. For the same reasons we find

substantial evidence supports the verdict reached by the jury, we find the answers to the interrogatories could be harmonized with the jury instructions, the evidence, and the inferences the jury could have drawn from the evidence. Consequently, we conclude the jury's answers to the interrogatories were consistent with each other and the jury's verdict was consistent.

**VI. Whether the District Court Erred in Denying the Motion for Directed Verdict.**

Crow complains the district court should have directed a verdict finding Simpson negligent for his conduct. He further alleges this constituted error requiring a new trial.

The district court instructed the jury on Simpson's alleged negligence, and the jury found Simpson was negligent. Crow did not prevail in this action because Simpson's negligence was not the cause of any item of Crow's damages. Thus, assuming the district court should have granted a directed verdict finding Simpson negligent, we find any such error harmless.

When a court denies a party's motion for a directed verdict and the jury finds in that party's favor on the issue upon which the party requested a directed verdict, there can be no prejudice to the moving party in light of the jury's verdict. *Spry v. Lamont*, 257 Iowa 321, 325–26, 132 N.W.2d 446, 449 (1965). In essence, the jury's verdict has the same effect as if the court had sustained the directed verdict. *See id.* Therefore, we find Crow's claim on this issue to be without merit.

**VII. Whether the District Court Abused Its Discretion in Finding the Verdict Effected Substantial Justice.**

Crow claims the district court abused its discretion in finding the verdict effected substantial justice between the parties. We have long recognized a trial court has inherent power to grant a new trial when a

verdict fails to administer substantial justice. *Thompson v. Rozeboom*, 272 N.W.2d 444, 446–48 (Iowa 1978). When the trial court concludes the verdict fails to administer substantial justice, the court may grant a new trial on grounds other than those listed in Iowa Rule of Civil Procedure 1.1004. *See Lehigh Clay*, 512 N.W.2d at 543–44 (discussing Iowa Rule of Civil Procedure 244, now rule 1.1004). However, the reason the verdict fails to administer substantial justice must be apparent in the record to justify the court's granting of a new trial. *Id.* at 544. The basis of Crow's claim is that the evidence demonstrated a causal connection between Simpson's negligence and Crow's damages such that the verdict failed to administer substantial justice by failing to compensate him for those damages.

A district court has broad discretion in deciding whether to grant or deny a new trial on the ground that the verdict failed to administer substantial justice between the parties. *Id.* at 544. We will find an abuse of discretion only when a district court has exercised its discretion " 'on grounds clearly untenable or to an extent clearly unreasonable.' " *Id.* (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 13 (Iowa 1990)). When the evidence amply supports the verdict reached by the jury, a district court abuses its discretion when it grants a new trial because it would have reached a different result. *Id.*

We agree with the district court's finding that the evidence supports the jury verdict. Therefore, we conclude the court did not abuse its discretion when it refused to grant Crow's motion for a new trial on the grounds the verdict failed to administer substantial justice. Accordingly, we find Crow's claim on this issue is without merit.

**VIII. Disposition.**

We vacate the decision of the court of appeals and affirm the judgment of the district court because substantial evidence supports the jury verdict, the jury's answers to the verdict interrogatories were not inconsistent, the district court's denial of the motion for directed verdict was harmless error, and the district court did not abuse its discretion in finding the verdict effected substantial justice.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**