# IN THE COURT OF APPEALS OF IOWA

No. 24-1041
Filed July 23, 2025


**RANDY LAVERN LEE,**
    Applicant-Appellee,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellant.
_____


Appeal from the Iowa District Court for Monona County, Jeffrey A. Neary, Judge.


The State appeals the district court's ruling on Randy Lavern Lee's application for postconviction relief. **REVERSED AND REMANDED.**


Brenna Bird, Attorney General, and Sheryl Soich (argued), Assistant Attorney General, for appellant State.

Gary Dickey (argued) of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellee.


Heard at oral argument by Tabor, C.J., Ahlers, Badding, and Buller, JJ., and Carr, S.J.* Schumacher, J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**CARR, Senior Judge.**

The State appeals the district court's ruling on Randy Lavern Lee's application for postconviction relief (PCR). The district court held that Lee's trial counsel was ineffective (1) for "failing to seek to introduce evidence concerning the victim's sexual comments reflecting her state of mind"; (2) for failing to hire an expert in "false allegations of sexual abuse"; (3) for failing to obtain the victim's medical records, and more specifically her mental health records; and (4) through the cumulative prejudice of his errors. Because Lee failed to establish his trial counsel was ineffective, we reverse the order granting PCR and remand to the district court for dismissal of Lee's application.

## I. Background Facts and Proceedings

On February 17, 2018, Lee and his romantic partner, Melissa Curtis, went out for a night of drinking with Curtis's friend, C.Q. C.Q., who lived in Wichita, Kansas, was visiting Curtis in Ute, Iowa. The two were "good friends" but had not seen each other in a long time. She had arrived in Ute the night before and the two friends stayed up late into the early morning catching up. Curtis testified in her pre-trial deposition that on the day following C.Q.'s arrival, she had "talked about her sex life all day" and that as they were all getting ready on the night of the seventeenth, she turned to Lee and asked if she "looked fuckable":

> I told [the Division of Criminal Investigation agent] that [C.Q.] got there. We talked for a couple hours. We went to bed. We got up. We made egg sandwiches. We hung out. She talked about her sex life the whole day.
> Then my mom [looked after my child]. Then we had a drink; well, [C.Q. and Lee] did. She took an hour getting ready, and as we were leaving to go to his parents' house, she asked [Lee] if she looked fuckable. Then we got into the vehicle. We went to his parents' house, and we had another drink.

That night the group stayed out until closing at 2:00 a.m. C.Q. went "all out" drinking "whiskey and coke[s]" because Curtis was paying for drinks. She agreed with other testimony that she might have had "ten to thirteen drinks," if not more. Curtis may have had "a couple or so" drinks because she was the designated driver. C.Q. testified that Lee occasionally talked to her and Curtis together, but that he was generally "off doing his own thing" with other people and never talked with her alone. She did not remember the ride home.

Once they had arrived back at Lee and Curtis's residence, C.Q. FaceTimed with her boyfriend, Daniel Smith. She then changed into pajamas and got into the guest bedroom bed with Curtis. "As soon as [she] laid down, [she] fell asleep. [She] passed out." The next thing she remembered was waking up to "feeling [Lee]'s penis going into [her] anus. And it was painful. The pain woke [her] up." She recalled that she was confused due to her intoxication. She recognized that her pajama pants "were pulled down to [her] knees" and she "was laying on [her] stomach." She then turned onto her back to make Lee stop and asked where Curtis was. Lee replied that, "[Curtis] is right here," but she did not see Curtis in the room. Lee then "shoved his penis in [her] mouth, and [she] started choking on it." She testified that she "froze" and did not fight back because she was not sure "if he would hurt [her]." Lee "eventually stopped" because she was not "reciprocating" and he said, "'Sorry. [Curtis] doesn't do this with me anymore.' And then he left [the] room."

C.Q. heard Lee leave the room and then "ran to [Curtis] in her bedroom," apologizing and telling her "what happened"—that Lee had raped her. She did not

remember the exact words she used but testified that she apologized because she felt bad about the situation and did not want to lose Curtis as a friend. Curtis testified that C.Q. was "acting like a loon." Curtis then found Lee and yelled at him and told him to leave the house; he did so. C.Q. then took a shower and vomited multiple times. She then FaceTimed Smith and told him what had happened—that Lee had raped her. She drove home to Wichita the next day and exchanged texts with Curtis. Curtis was supportive in these exchanges, but by Monday demanded to know why C.Q. had "put [Lee's] dick in [her] mouth." At this time, Lee had started "crying and pleading" to Curtis.

C.Q. saw a therapist and doctor the day after getting back to Wichita. Several months later, after initially attempting to make a report to the Monona County Sheriff's Office, she reported the incident to the Wichita police. She testified that she reported the assault because "it was just eating at [her]" and she "was having nightmares" where she was "fighting [Lee] off," unlike the night of his assault.

In January 2019, the State charged Lee via trial information with two counts of sexual abuse in the third degree, a class "C" felony, in violation of Iowa Code sections 709.1, .4(1)(a), .4(1)(d), and 903B.1 (2018). Lee pleaded not guilty to both charges, and the case proceeded to jury trial. At trial Lee argued the incident was consensual and that C.Q. had initiated everything, including the anal and oral penetration. He contended that he only went along with it because he believed Curtis was in the room with him and C.Q. A jury found Lee guilty on both counts. The district court sentenced Lee to concurrent sentences not to exceed ten years in prison along with a lifetime special sentence. We affirmed Lee's conviction on

direct appeal, finding "ample evidence supports a finding that Lee engaged in the sex acts against the complaining witness's will or while she was mentally incapacitated." *See State v. Lee*, No. 19-1585, 2020 WL 5944453, at *1 (Iowa Ct. App. Oct. 7, 2020).

Lee then filed for PCR, alleging ineffective assistance of trial counsel. The district court concluded Lee's trial counsel provided ineffective assistance in three instances and that the cumulative ineffective assistance prejudiced him. The district court granted Lee a new trial.

The State now appeals.

## II. Standard of Review

We generally review PCR proceedings for correction of errors at law, but our review is de novo when ineffective-assistance-of-counsel claims are raised. *See Linn v. State*, 929 N.W.2d 717, 729 (Iowa 2019).

## III. Discussion

The State argues that Lee's trial counsel was not ineffective and, alternatively, that Lee was not prejudiced by any individual or cumulative breach of duty. Lee contests error preservation as to the issues we address below. However, the trial court identified and ruled on each in the course of its order. *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012). The issues are properly before us. "Parties to an appeal frequently make novel arguments on preserved issues. Indeed, such arguments are at the heart of appellate advocacy and the purpose of oral argument." *State v. Tucker*, 982 N.W.2d 645, 656 n.2 (Iowa 2022).

"To establish a claim of ineffective assistance of counsel, the defendant must prove by a preponderance of the evidence: (1) that trial counsel failed to

perform an essential duty, and (2) that prejudice resulted from this failure." *State v. Fountain*, 786 N.W.2d 260, 265–66 (Iowa 2010). Failure to prove either element is fatal to an ineffective-assistance claim. *Id.*

There is no "checklist for judicial evaluation of attorney performance," rather "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "Judicial scrutiny of counsel's performance must be highly deferential" because "it is all too easy for [us] . . . to conclude that a particular act or omission of counsel was unreasonable" when colored by the "distorting effects of hindsight." *Id.*

Thus, the criminal defendant "is not entitled to perfect representation, rather representation which is within the normal range of competency." *State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). "Improvident trial strategy, miscalculated tactics, [or] mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *Osborn v. State*, 573 N.W.2d 917, 922 (Iowa 2008).

By charging Lee with two counts of sexual abuse in the third degree—one count for the act of anal penetration and one count for the act of oral penetration—the jury was instructed that the State would be tasked with proving the following:

> The State must prove all of the following elements of Sexual Abuse in the Third Degree:
> 1. On or about the 18th day of February, 2018, [Lee] performed a sex act with C.Q.
> 2. [Lee] performed the sex act:
>     a. By force or against the will of C.Q.; or
>     b. While C.Q. was mentally incapacitated or physically helpless, and [Lee] knew or reasonably should have known that C.Q. was mentally incapacitated or physically helpless.

*See* Iowa Code §§ 709.4(1)(a), .4(1)(d).  The jury was further instructed that a person is "mentally incapacitated" if that person is "temporarily incapable of controlling the person's own conduct due to the influence of a narcotic, anesthetic, or intoxicating substance," *see id.* § 709.1A(1), and "physically helpless" if "unable to communicate an unwillingness to act because the person is unconscious, asleep, or otherwise physically limited," *see id.* § 709.1A(2).

### A. *Introduction of Allegedly "Sexually Charged" Comment*

The district court found Lee's trial counsel was ineffective in "failing to seek to introduce evidence concerning [C.Q.'s] sexual comments reflecting her state of mind," specifically her statement "'do I look fuckable?' made to Lee directly prior to the sexual encounter on the night of the charged offense."  We note the trial court's framing of the issue incorrectly implies the challenged statement was made "directly prior to the sexual encounter."  It was made directly to Lee and Curtis, but was many hours before the sexual assault, as we detail above.

Under Iowa's rape shield law, "[e]vidence offered to prove that a victim engaged in other sexual behavior; or . . . [e]vidence offered to prove a victim's sexual predisposition" are not admissible in sex-offense cases.  Iowa R. Evidence 5.412(a).  But "[e]vidence of specific instances of a victim's sexual behavior with respect to the person accused of sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor" may be admitted by the court.  Iowa R. Civ. P. 5.412(b)(1)(B).

For the purposes of that rule, sexual behavior means "a volitional or non-volitional physical act that the victim has performed for the purpose of the sexual stimulation or gratification of either the victim or another person or an act that is

sexual intercourse, deviate sexual intercourse or sexual contact, or an attempt to engage in such an act." *State v. Baker*, 679 N.W.2d 7, 10 (Iowa 2004) (citation omitted). "Sexual behavior" under the rape shield law includes "precursor[s] to sexual activity." *State v. Alberts*, 722 N.W.2d 402, 409 (Iowa 2006) (finding skinny-dipping to be a precursor to sexual activity where victim wrapped her arms around a man's bare shoulders while the two were nude in a river).

Contrary to the belief of Lee's trial counsel, C.Q.'s statement would not have been prohibited by Iowa's hearsay rule or the rape shield law. First, the statement was not being offered "to prove the truth of the matter asserted in the statement"—that is, whether she looked "fuckable." Iowa R. Evidence 5.801(c)(2). And her statement is very different from the lewd precursors to sexual activity our appellate courts have found to qualify as sexual behavior under the rape shield law. *See Baker*, 679 N.W.2d at 10; *see also State v. Mayes*, No. 19-0252, 2020 WL 2060306, at *5 (Iowa Ct. App. Apr. 29, 2020) (finding the act of a minor victim watching a pornographic video shown to her by another adult to be a precursor to sexual activity); *State v. Kroll*, No. 23-0449, 2024 WL 4624605, at *6 (Iowa Ct. App. Oct. 30, 2024) (finding "sexting" to qualify as a precursor to sexual activity).

At trial, Lee's counsel stipulated to the State's motion in limine to exclude C.Q's statement. Lee's trial counsel suggested that the statement would be prohibited "unless the victim were to open the door somehow." We disagree, but the fact that the statement would have been admissible does not, in itself, support Lee's claim that his trial counsel's failure to introduce that statement was ineffective assistance.

If introduced, the statement would have had little to no probative value in support of Lee's claim that the assault was consensual. The statement's lack of probative value convinces us not only that trial counsel was not ineffective in failing to introduce it, but also that Lee was not prejudiced by that failure—even if we were to accept that trial counsel was ineffective in failing to seek admission of the statement. Because the statement, considered in conjunction with Curtis's testimony that she "talked about her sex life the whole day"—comments which Curtis never suggested were directed at Lee or any person in particular—suggests that C.Q. is a person whose thoughts are often expressed by her unfiltered and without reflection. Outside of that testimony, there are no interactions between her and Lee to support the theory that she would have initiated any sexual activity with Lee. She and Lee did not spend any time alone together that evening, with Lee "off doing his own thing." If her comment is meant to show her sexual intentions towards Lee, why would she make this one off-handed statement to him and then proceed never to display any instance of focused interest toward him during the rest of the evening? There are no other interactions between Lee and C.Q. for which this comment could provide further context. Using the statement as a basis for Lee's consent strategy is dubious at best, and no part of the record suggests that it would have been an essential duty for trial counsel to introduce the allegedly "sexually charged" statement, nor that Lee was prejudiced by its absence from the record. Finally, we note that proof of consent to the sex acts would avoid conviction under the "by force or against the will alternative," but not on the alternative allegation that she was "incapacitated." Our court found substantial evidence for both alternatives on direct appeal.

Trial counsel was not ineffective, and Lee suffered no prejudice, from his trial counsel's failure to introduce C.Q.'s allegedly "sexually charged" statement.

### B. Failure to Hire Expert on False Allegations

The district court also found Lee's trial counsel provided ineffective assistance in failing to hire an expert in "false allegations of sexual abuse," stating that "consultation and/or use at trial of such an expert as [the expert Lee hired for PCR] would very likely have helped [trial counsel] focus on the facts most important to the issues of consent, intoxication, and false accusations of sexual assault."

When an expert witness is called, "the jury is free to accept or reject" that expert's testimony in part or in whole. *Crow v. Simpson*, 871 N.W.2d 98, 105 (Iowa 2015). And "[w]e believe that the question of whether or not to call an expert witness is a matter of trial strategy," *Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988), so we do not "second-guess" trial counsel's "reasonable tactical decision[s]," *see Taylor v. State*, No. 19-1133, 2021 WL 211162, at *3 (Iowa Ct. App. Jan. 21, 2021). "Calling a defense expert would run the risk that the prosecutor's cross-examination would elicit adverse information." *State v. Majors*, 940 N.W.2d 372, 392 (Iowa 2020).

The expert Lee hired during PCR proceedings stated that he would have "educated trial counsel that false allegations of rape are a real occurrence and a legitimate concern" and that there are "different motives for making false rape allegations." The expert would also refer to his report which cites research that "intoxication and lying to avoid negative consequences" can motivate false

allegations. Lee's trial counsel testified at his deposition that he never consulted with an expert regarding false sexual assault accusations.[1]

We find that Lee's trial counsel was not ineffective in his failure to consult an expert witness for several reasons. First, trial counsel is an experienced criminal defense attorney with over thirty years of trial experience. Issues of sexual assault allegations and the common defense theory in which the defendant paints the accusations as false are not novel to him. We believe experienced criminal litigators know that "false allegations of rape are a real occurrence." It is within the range of ordinary competence to proceed without retention of an expert on the subject unless some other aspect of the case may require it. This holds especially true when trial counsel consults with other experienced criminal attorneys on the matter, as Lee's trial counsel testified to having done.

Second, and most importantly, we fail to see how such an expert would have been helpful in this case. The possibility that alcohol "intoxication and lying to avoid negative consequences" can motivate false allegations is not a foreign concept to lay jurors, and C.Q. herself testified to the effects alcohol had on her memory and perception on the night of the assault. Further, Lee's trial counsel did not want to "emphasize [her] level of intoxication" that night due to the jury instruction allowing for the jury to find that Lee assaulted her if she was

---

[1] Trial counsel later testified at the PCR trial that he did, in fact, consult an expert in Omaha, Nebraska. We choose to defer to the district court's credibility finding that the Omaha expert "was not formally consulted nor retained and from this evidence it is clear that he offered no opinions on Lee's case, nor were any solicited from him."

incapacitated. That was a reasonable concern informing a legitimate tactical decision by Lee's counsel.

And the jury became familiar with the potential motivations for C.Q. to lie about the assault—motivations that we would argue are much more compelling than generalized statistics about false accusations. The theories that she accused Lee of assault out of a sense of regret and a desire to avoid conflict with both her friend and significant other were heavily litigated by Lee's trial counsel and are powerful incentives that any juror could understand. Indeed, Lee's trial counsel framed the case as "a case of betrayal." We also consider the reality that an expert's testimony on this issue could not tread much beyond generalities due to the potential for impermissible vouching relating to C.Q.'s credibility. *See State v. Dudley*, 856 N.W.2d 668, 689 (Iowa 2014).

For these reasons, Lee's trial counsel was not ineffective in failing to hire an expert in false allegations of sexual abuse.

## C. Failure to Investigate Medical Records

The district court also found that Lee's trial counsel was ineffective in failing to obtain C.Q.'s medical records, and more specifically her mental health records. We choose to resolve this issue on the prejudice prong because the district court seemed to concede that Lee has provided no plausible theory of how he was prejudiced on this issue. The district court admitted "it is difficult on this evidence to discern where [C.Q.'s medical records] would have led" and it was "not aware of what the records might have revealed." Lee attempts to buttress the district court's ruling on multiple unsupported theories that "[C.Q.'s] bipolar diagnosis and noncompliance with her prescription medication" would affect "her ability to

perceive and recall events," or alternatively, that a lack of medical diagnoses would show she "is untruthful about her mental health."

We agree with the district court's assessment that the results of such a medical inquiry are purely speculative. We find that Lee's proposed "fishing expedition" premised on "a generalized hope, rather than a reasonable probability" that her medical "records will contain exculpatory information," *see State v. Garcia*, No. 20-0227, 2021 WL 210744, at *4 (Iowa Ct. App. Jan. 21, 2021), falls far short of the standard of "reasonable probability" required under Iowa Code section 622.10(4)(a)(2)(a), *see State v. Thompson*, 836 N.W.2d 470, 484 (Iowa 2013) (defining "reasonable probability" as "a substantial, not just conceivable, likelihood" (cleaned up)). Lee was not prejudiced by his trial counsel's failure to seek to obtain C.Q.'s medical records. Such an attempt would have been properly denied, and in any event, it is speculative whether the records would have assisted in the defense in any way.

Lastly, because we have found Lee's trial counsel did not breach his duty or prejudice Lee in any of Lee's individual claims, we reverse the district court's finding of cumulative prejudice.

## IV. Disposition

Because Lee failed to establish his trial counsel was ineffective, we reverse the district court's order granting Lee PCR and remand to the district court for dismissal of Lee's application.

**REVERSED AND REMANDED.**

Tabor, C.J., and Ahlers and Badding, JJ., concurs; Buller, J., specially concurs.

**BULLER, Judge** (specially concurring).

Embedded in this case is a material misunderstanding about vernacular use of the word "fuckable" when describing one's physical appearance. The district court apparently thought the victim asking, "Do I look fuckable?" while getting dressed to go out to the bars was a sexually charged statement or even an invitation to sexual contact hours later that night. I agree with the majority opinion that the district court got the facts and law fundamentally wrong in granting a new trial, and I concur in the judgment to reverse. I write only to address the vocabulary issue.

Asking whether one looks "fuckable" in this context is akin to asking whether you look "good," "attractive," "desirable," or "hot." *See, e.g.*, *Fuckable*, Collins Dictionary, https://perma.cc/262D-U4T9; *Fuckable*, Oxford English Dictionary, https://perma.cc/SG38-S8NS; *see also Montgomery v. St. John's United Church of Christ*, No. 2022 CA 00025, 2023 WL 2820472, at *3 (Ohio Ct. App. Apr. 6, 2023) (comparing "fuckable" to "sexually attractive"). It's not an invitation to sex. It's just coarse language. And the use of coarse language is irrelevant to consent.

It's important that courts—and the judges that comprise them—be mindful of lexical change and other shifts in culture. As stressed at oral argument, what one generation views as coarse language is the common vocabulary of another. *See* Constance Grady, *Why the **** does everyone swear all the ******* time?*, Vox (Mar. 14, 2024), https://perma.cc/W82L-DU28 (discussing this phenomenon). This case is a reminder that cultural sensitivity by courts extends to language and understanding how words are used in modern syntax.